**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**SHAUN P. FOSTER,**

 **Plaintiff,**

**v.**                                                         **CASE NO. 2:13-cv-0014354**

**CAROLYN W. COLVIN,**
**Commissioner of Social Security,**

 **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's applications for children's disability insurance benefits (DIB) and supplemental security income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings (ECF No. 10) and a Memorandum in Support of her Motion for Judgment on the Pleadings (ECF No. 11).

Claimant, Shaun P. Foster, filed applications on March 5, 2010. In both applications, Complainant alleged disability beginning January 1, 1996. As required by section 202(d) of the Social Security Act, to be entitled to child's insurance benefits, the claimant must have a disability before attainment of age 22. Born on January 8, 1978, Claimant had not attained age 22 as of January 1, 2996, the alleged onset date. The claims were denied initially and upon reconsideration. Claimant filed a written request for hearing on February 17, 2011. A hearing was held on March 30, 2012. The record was held open for ten days following the hearing to

allow Claimant to submit additional evidence.  Claimant's brief and updated medical records were added to the record as Exhibits 17E and 14F.[1]  On April 10, 2012, the Administrative Law Judge (hereinafter ALJ) held that Claimant had not been under a disability from his alleged onset date of January 1, 1996, through the date of the decision.  Claimant sought review of the Appeals Council on April 30, 2012.  The Appeals Council denied review on April 23, 2013.  On June 14, 2013, Claimant filed a complaint with this Court objecting to the final decision (ECF No. 2).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

In this particular case, the ALJ determined that Claimant has not engaged in substantial gainful activity since the alleged onset date (Tr. at 17).  The ALJ found that Claimant suffers from the severe impairments of borderline intellectual functioning and mood disorder (Tr. at 18).  The ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1 (Tr. at 19).  The ALJ then found that Claimant has a residual functional capacity (RFC) to perform light and sedentary exertional work, reduced by nonexertional limitations[2] (Tr. at 21, 26).  Transferability of job skills is not an issue because Claimant does not have past relevant work experience (Tr. at 26).  The ALJ concluded that Claimant could perform

---

[1] After a review of the evidence, the Administrative Law Judge noted that the new exhibits did not change the residual functional capacity and did not affect the vocational expert's testimony or the decision.

[2] Claimant is capable of performing simple instructions and tasks but is functionally illiterate. Claimant should have less than occasional incidental contact (two hours or one-third of a workday) with the public and frequent contact (one-third to two-thirds or six hours of a workday) with co-workers and supervisors. Work should preclude teamwork and involve no fast-paced work or strict production quotas (Tr. at 21).

jobs such as laundry worker, night cleaner and food sorter (Tr. at 26).  On this basis, benefits were denied (Tr. at 26-27).

**Scope of Review**

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was defined as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the Courts must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

**Claimant's Background**

Claimant was born on January 8, 1978.  Claimant was retained in first and ninth grades.  He attended special education classes part-time beginning in the third grade.  Claimant graduated high school in 1998 (Tr. at 213).   His previous work activity did not rise to the level of

substantial gainful activity.   Under the Social Security Act, to be entitled to child's disability insurance benefits, Claimant must have a disability that began before attainment of age 22. Claimant's alleged onset date of disability was prior to his twenty-second birthday.

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(C)(i). Under the regulations in force during all times relevant to Claimant's claim, the ALJ must determine whether the child is engaged in substantial gainful activity.   20 C.F.R. § 416.924(b) (2013).  If the child is, he or she is found not disabled.   *Id.* § 416.924(a).   If the child is not, the second inquiry is whether the child has a severe impairment.   *Id.* § 416.924(c).   An impairment is not severe if it constitutes a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."   *Id.*   If a severe impairment is present, the third and final inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   *Id.* § 416.924(d).   If the claimant's impairment meets or functionally equals the requirements of Appendix 1, the claimant is found disabled and is awarded benefits.   *Id.* § 416.924(d)(1).   If it does not, the claimant is found not disabled.   *Id.* § 416.924(d)(2).

**The Medical Background**

Claimant's medical records reflect that he went to Cabin Creek Health Center on January 22, 2009, with complaints of shoulder pain with limited range of motion. An x-ray showed no evidence of acute right shoulder fracture or dislocation (Tr. at 349).  Claimant was advised to use

Tylenol or ibuprofen as needed for pain. Because there were no significant limitations regarding the shoulder pain, the ALJ found this not to be a severe impairment (Tr. at 18). Cabin Creek Health Center's records from January 2009, note a history of alcohol abuse with only occasional current use of alcohol. Claimant admitted to using marijuana on occasion (Tr. at 337, 341). In June 2010, Lester Sargent, M.A., diagnosed alcohol dependence after Claimant reported a history of alcohol use associated with tolerance and withdrawal symptoms and alcohol use within the week prior to his evaluation. At the hearing, C. David Blair, Ph.D., testified that he found no limitations from drug or alcohol use. The ALJ held that Claimant's alcohol abuse disorder or marijuana use are not severe impairments as they result in no more than a minimal effect on his ability to do basic physical and mental work activities.

Claimant has been diagnosed with diabetes mellitus II. Consistent with the medical evidence of record, Judith Brendemuehl, M.D., testified at the hearing that Claimant has no limitations as a result of the diabetes. The record shows Claimant is not regularly checking his blood sugars and is not following a specific diet, but he is walking for exercise. Dr. Brendemuehl testified that Claimant had no exertional limitations (Tr. at 35). The ALJ gave great weight to Dr. Brendemueh's opinion as it was consistent with the medical record as a whole (Tr. at 18).

Claimant was diagnosed with gastroesophageal reflux disease (GERD). Accordingly, he was prescribed Nexium. Claimant reported that Nexium worked well for him (Tr. at 335). Claimant was prescribed Trazadone for insomnia. He reported that he stopped taking it after a couple of days (Tr. at 337). To have a severe impairment, the medical evidence must establish more than a slight abnormality or combination of slight abnormalities. The abnormality must have more than a minimal effect on an individual's ability to work. The impairment must significantly limit a person's physical or mental ability to do basic work activities (Social

Security Regulation 85-28) for a continuous period of at least twelve months. Accordingly, the ALJ held that "The evidence fails to show any of these conditions were severe" (Tr. at 18).

Claimant was diagnosed bipolar with no evidence of any testing. Dr. Blair testified that after reviewing the medical records, he found no explanation for the diagnosis. Dr. Blair's diagnosis was depression and borderline intellectual functioning. Cabin Creek Health Center prescribed Lithium for the bipolar diagnosis. Claimant stopped taking the Lithium after two weeks. Claimant stated that he was not taking his medication because he did not understand. If an impairment can be reasonably controlled or is reasonably amendable to treatment, it cannot serve as a basis for a finding of disability. 20 C.F.R. §§ 404.1530, 416.930; *Gross v. Heckler*, 785 F.2d at 1166. The ALJ found that Claimant was successfully controlling symptoms when taking his medications.

Evaluating psychologists diagnosed Claimant with borderline intellectual functioning since he was nine years old. In 1987, Susan Parker, M.A., a certified school psychologist noted that Claimant seemed to enjoy testing and worked hard on the tasks presented. On the Wechsler Intelligence Scale for Children-Revised (WISC-R), he obtained a verbal IQ of 92, performance IQ of 80 and a full scale IQ of 85, plus or minus three (+/-3). Claimant's most significant weakness was in math and visual analysis. In 1991, Ms. Parker tested Claimant again. Claimant obtained a verbal score of 79, performance score of 69[3] and full scale of 72, plus or minus three (+/-3). In January 1992, his verbal score was 75 and his performance and full scale scores were 72, plus or minus three (+/-3). In December 1993, school psychologist, Constance Murray, M.A., administered a Wechsler Intelligence Scale (WISC-III) which Claimant scored 75 in verbal, 70 in performance and a full-scale IQ of 70. In 1997, Claimant was tested again resulting in a

---

[3] Neither party presented an explanation for the decrease in Claimant's performance IQ score in 1991.

verbal IQ of 76, performance IQ of 72 and a full scale IQ of 73.   Even though the school psychologist, Ms. Murray, considered Claimant a high-risk student due to his borderline intellectual ability, he graduated high school.

Claimant lives with his sister and previously lived with his mother.  He has never lived alone.  He has difficulty reading.  Claimant's sister takes care of his food stamps.  She assisted him with the forms for his disability application appeal.  He can write if someone helps him spell.  He cannot make change and does not have a driver's license. Claimant has difficulty getting along with others.  His brother tried to kill him over a sweatshirt, causing Claimant to have to defend himself.  Claimant threw a block through his sister's car window because she would not take him to a friend's funeral.  In January 2012, he struck another man because he told on Claimant's niece resulting in her going to jail.

**Claimant's Challenges to the Commissioner's Decision**

**A.  Listing 12.05C**

Claimant asserts the ALJ committed reversible error in not finding that Claimant meets and/or equals the requirements of Listing 12.05C.  Claimant argues that his performance IQ score falls within the range of 60 through 70.  Claimant asserts that when a margin of error is applied to his test scores, his IQ scores fall within IQ score range of 60 through 70 as required under Listing 12.05.  Claimant asserts that he suffered the manifestation of deficits in adaptive functioning prior to the age 22.  Claimant states that his school records prove that he repeated the first and ninth grades and that he was in special education classes throughout his education. Claimant argues that his results of Adaptive Behavior Evaluation Scale Revises – School Version, administered on October 14, 1997, demonstrated that he was within the deficit range for

8 of the 10 adaptive behavior areas.  Claimant asserts that he has additional severe impairments that impose work-related limitations.  Claimant argues that several court of appeals have held that a finding of a severe impairment establishes the second prong[4] of Listings 12.05C.

Defendant asserts that Claimant failed to demonstrate that his physical or mental impairment is severe to the point of preventing him from engaging in any substantial gainful activity that exists in the national economy.  Defendant asserts that Claimant failed to satisfy his burden of demonstrating that his condition met or equaled the mental retardation Listing 12.05.  Defendant asserts that no physician or psychologist diagnosed Claimant as mentally retarded.  Defendant states that Claimant incorrectly argues that a minus point margin of error can be applied to an IQ score to lower the score to qualify for Listing 12.05.  Defendant asserts that Claimant failed to establish that he had significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., that the evidence supports onset of the impairment before age 22.

**B.  Social Security Regulation 85-15**

Claimant argues that evidence of record documents that he is disabled and unable to perform the basic mental demands of unskilled work as described in SSR 85-15. Claimant argues that he is unable to complete the basic demands of competitive, remunerative, unskilled work. He asserts that despite his favorable age, education and work experience, the occupational base

---

[4] Listing 12.05C requires that the introductory language of Listing 12.05 be satisfied, as well as the paragraph C requirement.  Therefore, the second prong to Listing 12.05C is the paragraph C requirement of a "valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

would be so eroded by his mental impairments that he could not sustain substantial gainful activity.[5]

Defendant asserts that Claimant was assessed as being able to understand, remember and make simple work decisions, adapt to work with initial supervision and follow simple work instructions. Defendant asserts that Claimant had the capacity to perform work at the substantial gainful activity level. Claimant was assessed as retaining the ability to learn, recall and perform simple, unskilled work-like activities. Defendant asserts that the ALJ accommodated Claimant's limitations in a hypothetical to the vocational expert and the vocational expert testified that Claimant could perform several unskilled jobs.

**Discussion**

**A. Claimant failed to demonstrate that he meets or equals Listing 12.05C**

Claimant applied for DIB and SSI on January 1, 1996, due to illiteracy, diabetes mellitus type II, bipolar disorder and dyslexia. Claimant argued at the administrative hearing and in his Brief that he suffers from mental retardation, Listing 12.05. The Code of Federal Regulations lists the impairment as:

> 12.05   *Mental retardation:*   Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports the onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow

---

[5] During a psychiatric evaluation in June 2010, Claimant reported that his longest period of employment lasted one (1) month. He has worked general labor jobs (Tr. at 370).

directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B.  A valid verbal, performance, or full scale IQ of 59 or less;

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

In order to meet the criteria of Listing 12.05C, the regulations require that Claimant must meet the introductory language of Listing 12.05, which states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R., Subpt. P, App. 1, § 12.05 (2005); *see also* § 12.00A (stating that for Listing 12.05, claimants must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria).  Listing 12.05C also requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function."   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2013).

A claimant may not meet the mental retardation Listing at 12.05C unless his impairment satisfies, both prongs, (1) the diagnostic description in the introductory paragraph of Listing

12.05 and (2) the specific criteria of 12.05C. 20 C.F.R. pt. 404, subpt. P, app.1, § 12.00A. The ALJ held that paragraph C criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The ALJ stated "Although the claimant obtained a performance score of 69 in 1991, subsequent scores were 70 and above, falling within the borderline intellectual functioning range" (Tr. at 20).

Claimant argues that he satisfies the requirements of Listing 12.05C. Claimant asserts in his Brief in Support of Judgment on the Pleadings the following:

> [He] was first referred to the Department of Exceptional Children (DEC) while in the second grade and was evaluated on May 28, 1987 at age 9 (Tr. 299, 301-302). Although [he] had been retained in the first grade, by third grade [he] was continuing to perform at a first grade level and was completing only a very low level of work in all academic areas (Tr. 299). During the first cognitive evaluation, [Claimant] was administered the Wechsler Intelligence Scale for Children - Revised (WISC-R), the Bender Visual Motor Gestalt Test (Bender-Gestalt) and the Koppitz Human Figure Drawing Test. [Claimant] was found to have a Full-Scale IQ of 85 (+/-3), which would later prove to be an anomaly, and to function at the developmental age of 6 years old with visual-motor skills in the mentally impaired range (Tr. 302-303). As a result of this evaluation, [Claimant] was recommended for special education services and speech therapy (Tr. 302-303).

[Claimant] was reevaluated on January 18, 1991, while in the sixth grade at age 13 (Tr. 304).  [Claimant] again was administered the WISC-R, Bender-Gestalt and Koppitz drawing tests (Tr. 304-305).  [Claimant] obtained a verbal IQ of 79, performance IQ of 69 and a full-scale IQ of 72 (+/-3).  The Bender-Gestalt results indicated that [Claimant] was developmentally equivalent to a 7.5 or 8-year-old child.  Continued placement in the learning disabilities classroom was recommended (Tr. 305).

The following year, on January 30, 1992, [Claimant] was reevaluated while in the seventh grade at age 14 (Tr. 306-308).  [Claimant] was noted to have a slight speech impediment and did not display much facial expression during the evaluation.  Cognitive testing results indicated a verbal IQ of 75, performance IQ of 72 and full-scale IQ of 72. [Claimant] was noted to function at the borderline range of abilities and at the developmental age of 9 or 10 years old.  The examiner stated that [Claimant] was a high education risk and slow learner (Tr. 308).  On May 19, 1992, the Educational Assistance Team assembled an Individual Education Plan (IEP) for [Claimant], which provided that he would attend regular classes 40 percent of the time, but only to include homeroom, lunch, cluster, physical education and health.  The remaining 60 percent of class time would be experienced in a self-contained special education classroom, and [Claimant] was exempt from participating in state-county testing.  (Tr. 304-314).

In December 1992, [Claimant] was reevaluated and administered the Wechsler Intelligence Scale for Children - Third Edition (WISC-III), which yielded a verbal IQ of 75, performance IQ of 70 and a full-scale IQ of 70.

12

[Claimant] was found to function at the 9 to 10 year-old level and demonstrated difficulty with visual-motor integration skills (Tr. 318-319).   A classroom observation, dated December 7, 1993, noted that [Claimant] was extremely quiet and required much assistance from the teacher during seat work (Tr. 322).   A teacher evaluation, dated January 28, 1994, indicated that [Claimant's] weaknesses included expressing thoughts and ideas, following directions and completing daily assignments (Tr. 324-325).

At age 19, [Claimant] was evaluated on February 3, 1997, and noted to have difficulty focusing his attention selectively and demonstrated an inconsistent style of responses and problem solving.  [Claimant's] responses were described as "occasionally impulsive and thoughtless" (Tr. 326-327).  Additionally, the examiner stated [Claimant] showed some frustration as complexity increased. [Claimant] was administered the Wechsler Adult Intelligence Scale - Revised (WAIS-R) and found to have a verbal IQ of 76, performance IQ of 72 and full-scale IQ of 73 (+/-4).  The Bender- Gestalt test once again showed [Claimant] had significant visual-motor deficits and was functioning at the 9 or 10-year-old developmental age (Tr. 326-328).  On October 14, 1997, [Claimant] was administered the Adaptive Behavior Scale Revised - School Version, which indicated adaptive deficits in eight of the 10 areas, including communication skills, home living, social, self-direction, health and safety, functional academics, leisure and work (Tr. 329-330). (ECF No. 10).

Defendant asserts that although the ALJ found that Claimant had borderline intellectual functioning and a mood disorder, there was no finding that Claimant met or equaled Listing

12.05C for mental retardation. Defendant continues to assert that Claimant has never been under the care of a psychiatrist, psychologist or counselor. He was never diagnosed as having mental retardation, bipolar disorder or posttraumatic stress disorder (PTSD) by a physician or psychologist or any accepted medical source under the regulations.

Although Claimant places great emphasis on the single IQ score of 69 in performance obtained in 1991, Defendant asserts that Claimant still failed to meet the Listing requirements for 12.05C. Defendant asserts that Claimant failed to demonstrate that he satisfied the second prong of having "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," i.e., that the evidence supports onset of the impairment before age 22. *See* 20 C.F.R. Pt. 404, Subpart P, App. I, Listing 12.05. Claimant asserts deficit in adaptive functioning is illustrated by his placement in special education classes, his repeating first and ninth grade, various academic achievement test scores and adaptive test scores in 1997 which scores showed that Claimant functioned at an 18 year, 11 month level although Claimant's chronological age was 19 years, 8 months.

The ALJ also found that Claimant did not satisfy the criteria for paragraph B because he did not have a valid verbal, performance or full scale IQ of 59 or less. The ALJ found that Claimant did not satisfy paragraph C criteria because he did not have a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The ALJ pointed out that although Claimant "obtained a performance score of 69 in 1991, subsequent scores were 70 and above, falling within the borderline intellectual functioning range."

14

Claimant relies on language in the code of Federal Regulations that states in "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." *See* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.0(D)(6)(c). Claimant further argues that "when the margin of error is properly applied, results of Claimant's 1997 and 2010 cognitive testing fall within the valid IQ score between 60 and 70 requirement of Listing 12.05C."

Based on the aforementioned, the undersigned finds that the ALJ was correct in determining that Listing 12.05C was not met.  The ALJ gave great weight to the opinion of Dr. Blair as it was consistent with the medical evidence of record (ECF No. 25).  Dr. Blair testified that he opined Claimant to be able to perform work following simple instruction at a moderate pace (Tr. at 43).  The ALJ correctly held that Claimant's allegations that he is incapable of all work activity as not credible because of inconsistencies in the record and overall lack of objective evidence to support his allegation of being incapable of all work activity.  The totality of the records reveals Claimant is able to engage in basic work activities despite the limitations from his impairments. (*Id.*)

Claimant's argument that a margin of error can be applied to lower his IQ score is incorrect.  In *Burns v. Barnhart*, 312 F.3d 113, 125 (3rd Cir, 2002) the Court explained "if we were to read an error range of five points into the regulation, it would violate the plain language of the regulation, which requires "[a] valid verbal, performance or full scale IQ of 60 through 70."  The Court further explained that applying the margin to decrease a score five (5) points could also be argued to increase a score five (5) points since the margin of error is plus or minus five (5) points.

The ALJ considered Claimant's IQ scores and held that:

> His working memory was 67 and described as extremely low.   His recent memory and concentration were severely deficient.  Although he required occasional repetition of directions, he demonstrated no significant frustrations after giving an incorrect response, his immediate memory was normal and remote memory only mildly deficient.  Mr. Sargent diagnosed mood disorder, not otherwise specified, and based on mood symptoms that do not meet the criteria for any specific mood disorder.   Borderline intellectual functioning was diagnosed based on the current testing that indicated that claimant's full-scale IQ falls within the 71 to 84 range.  Although the evidence shows a performance scale of 69 in 1991, overall testing indicates that the claimant's IQ falls within the range noted by Mr. Sargent (Exhibits IF and 6F).  Although the claimant obtained a low working memory score, C. David Blair, Ph.D., pointed out that the claimant was able to remember the instructions, follow the instructions and switch from one task to another (Exhibit 1F and hearing testimony).  Even though in 1997, he displayed the deficits in communication, home living, social, self-direction, health and safety, functional academics, leisure and work, he displayed average adaptive functioning in self-care and community use.   Scores indicated a need for assistance with increasing his skills in these areas (Exhibits 1F and 6F).

The claimant was prescribed medications for mood disorder, but the claimant often stopped taking the medications because they "made me feel weird." However, records from Cabin Creek Health Center reveal that the medications have been relatively effective in controlling the claimant's symptoms. On February 15, 2009, Mr. Foster's sister reported that he had been doing well since his prior visit in January 2009, despite the fact that he stopped taking medication two weeks after it was started. In May 2009, his niece reported the claimant's mood was better and although he had some anger outbursts, for the most part he felt he was doing well. It was noted that he was not taking any medications (Exhibit 2F). In March 2010, Betsy Kent, MSW, assessed "bipolar disorder, NOS, by report, appears anxious as well, likely PTSD." She noted the claimant had never been psychiatrically hospitalized. Subsequent records include consistent reports of the claimant doing well as long as he is compliant with medication (Exhibits 13F and 14F).

There is evidence that the claimant has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application. Although prescribed Lithium for the treatment of bipolar disorder, the claimant stated he did not want to take any medication and refused mood

stabilizers (Exhibit 2F). In January 2012, Mr. Foster refused to take mood stabilizers although he acknowledged, "I need to" (Exhibit 14F).

Consistent with the medical records, C. David Blair, Ph.D., testified that the claimant's instructional level was special education and at times, he maintained an average grade level. However, in the sixth grade, it was noted he was working at a third grade level. Intelligence testing consistently showed below average. Subsequent evaluations noted a full scale of 85 but then the scores drop for unexplained reasons and validity was not mentioned. It appeared he was not accumulating information over time. Testing records never mentioned overall intellectual ability or reading. His WAIS IV score was consistent with school records at 72. WRAT IV showed sense comprehension was about seventh grade level. Dr. Blair noted there were no psychometric validity indicators from Mr. Sargent. He concluded that the claimant had no learning disorder because the discrepancy in IQ scores and his performance is not "that big" but he definitely has problems with performance. His functional level has never placed him in the mentally retarded range. Although he does have low IQ scores, it is difficult to explain the Bender Gestalt score from 1989, as the rest of his scores have been consistent and have always been below his actual age. He is functionally illiterate. None of the records

from Cabin Creek mentioned problems with either overall intellectual ability or reading.

Dr. Blair noted that Mr. Foster was diagnosed bipolar with no evidence of a "work up" and was prescribed Lithium.  He did well most of the time.  He stopped Lithium after two weeks and although Trazadone was prescribed, he stopped taking it.  None of the earlier bipolar symptoms was explained.  He was also diagnosed with post-traumatic stress disorder (PTSD) after reports of his father having violent anger issues, but the evidence fails to establish any particular symptoms of PTSD.  An angry mood and irritability has been reported but does not diagnose anything in particular.  Dr. Blair noted that claimant's behavior has been fairly reasonable.  A physician's assistant at Cabin Creek prescribed Lamictal but he did not take it and his sister said he was irritable.  Once he was taking the Lamictal, his sister reported better behavior.  He has had no psychiatric treatment, has only been treated by a physician's assistant with some intervention with a MSW, but Dr. Blair found no explanation for their diagnoses.  Dr. Blair noted that anger does not appear to have caused problems and the claimant maintains well even when not taking medications.  Dr. Blair gave the diagnoses of depression and borderline intellectual functioning, but not a true learning disability because academic performance and scores are low (ECF No. 23-24).

19

A score between 60 and 70 is only one prong required under paragraph C of Listing 12.05.  Claimant must also demonstrate a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Rabah Boukhemis, M.D., performed a Physical Residual Functional Capacity Assessment of Claimant on May 21, 2010 (Tr. at 358-365).  Dr. Boukhemis concluded that Claimant had no severe limitations from physical impairments.  On May 24, 2010, Dr. Boukhemis completed a case analysis which stated that Claimant's limitations from a physical stand point were not credible (Tr. at 367).  The ALJ gave great weight to this opinion as it was consistent with the testimony at the hearing, medical evidence and the limitations set forth in the decision (Tr. at 25).

**B.  SSR 85-15**

The regulations provide that the basic mental demands of competitive, remunerative, unskilled work require an individual to have the ability to (1) understand, carry out and remember simple instructions; (2) to respond appropriately to supervision, coworkers and usual work situations; and (3) to deal with changes in a routine work setting on a sustained basis.  Social Security Ruling 85-15.

On June 3, 2010, Lester Sargent, M.A., completed a psychological consultative evaluation of Claimant and administered the Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV) and Wide Range Achievement Test - Fourth Edition (WRAT-4) (Tr. at 368-373).  Claimant reported that he was thirty-two (32) years old at the time and living with his sister in Boone County, West Virginia (Tr. at 368).  Claimant's sister drove him approximately 25 miles to the evaluation.  Claimant's Chief Complaint was reported as "I'm slow.  I'm bipolar.  I can't

read and I have diabetes" (Tr. at 369).  Claimant admitted that he was retained in the first and ninth grades.  (Tr. 370).

Claimant reported to Mr. Sargent that he has a history of alcohol use that has led to tolerance and withdrawal symptoms (Tr. at 369).  Claimant reported a previous diagnosis of pancreatitis.  He reported to using alcohol during the year prior to his examination and stated that his last consumption of alcohol consisted of six (6) beers and "a little moonshine" within the week prior to the evaluation.  He has never been treated for alcohol or substance abuse (Tr. at 370).  Claimant denied the use of illegal substances and reported compliance with his prescription medications.  (*Id.*) Claimant smokes approximately one (1) pack of cigarettes per day.  Claimant reported to receiving treatment from Cabin Creek Health Center in Kanawha County, West Virginia, for depression and anxiety (Tr. at 369).  Claimant reported taking Nexium for acid reflux and heartburn, Lisinopril for high blood pressure and fish oil.

Mr. Sargent performed an intellectual assessment of Claimant during the psychiatric evaluation (Tr. at 370-373).  WAIS-IV results revealed Claimant to have a verbal IQ of 78 and full-scale IQ of 72.  During the mental status exam, Claimant was observed to have an anxious mood, a broad affect with exaggerated intensity and loquacious speech (Tr. at 371).  Claimant's immediate memory was normal based on his ability to instantly recall four of four words. Claimant's recent memory and concentration were severely deficient and he was unable to identify the correct day of the week.  As a result of the cognitive test scores and examination, Mr. Sargent diagnosed Claimant with mood disorder NOS, alcohol dependence, learning disabilities and borderline intellectual functioning.  Mr. Sargent reported that the diagnosis of Borderline Intellectual Functioning is based on WAOS-IV results indicating Claimant's Full Scale IQ fell within the 71 to 84 range (Tr. at 372).

Claimant self-reported to eating out once a month, going to the store and running errands once a month and walking for exercise daily.  He talks on the telephone daily.  His hobbies include hunting, fishing and riding a four-wheeler.  He does not attend church or other social functions.  He reported to maintaining contact with several friends. He reported to receiving food stamps and managing his finances (Tr. at 373).  He reported to receiving financial assistance from his sister.  Claimant does not maintain a checking account.

Claimant is able to perform personal care independently.  He prepares small meals, washes dishes, mows grass, washes laundry and takes out the trash.  He goes shopping and out to eat with others.  He spends time with his family.  He loses his temper easily with others.  Claimant needs reminders for medication and appointments.  He has difficulty concentrating on tasks.  He needs assistance with paying bills, counting change and managing bank accounts.  He spends time playing on the computer and watching television.  Claimant cannot read or follow written instructions but can follow spoken instructions.

### i.  Residual Functional Capacity

Paragraph D of Listing 12.05 requires that mental impairments must result in at least two of the following:   marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

On July 23, 2010, Frank Roman, Ed.D., performed a Psychiatric Review and found that Claimant was moderately limited in maintaining social functioning, concentrations, persistence and pace and mildly limited in his daily activities (Tr. at 376-395).  Dr. Roman opined that Claimant retained the capacity to understand, remember and make simple routine decisions and adapt to work with initial supervision and follow one to two step work instructions.  Dr. Roman assessed Claimant to have the capacity to perform significant gainful activity level work (Tr. at 393).

To determine whether Claimant is able to perform a significant number of jobs existing in the national economy, the ALJ identified Claimant's residual functional capacity (RFC).  The ALJ found that Claimant displayed average adaptive functioning in self-care and community use (Tr. at 23).  The ALJ held that as to activities of daily living, Claimant had described daily activities, which were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations (Tr. at 24).  The ALJ found that "[C]laimant's work history shows sporadic work activity and raises a question as to whether [C]laimant's continuing unemployment is actually due to medical impairments." (*Id.*)  The ALJ held that "The totality of the records reveals the claimant is able to engage in basic work activities despite the limitations from his impairments" (Tr. at 25).  The ALJ did  not find Claimant's allegations that he is incapable of all work activity to be credible because of the inconsistencies in the record and overall lack of objective evidence to support this allegation.

A Psychiatric Review by Debra Lilly, Ph.D. on December 11, 2010, found insufficient evidence of a mental impairment prior to January 2000 (Tr. at 395-423).  Dr. Lilly concluded that Claimant had mild limitations in activities of daily living and social functioning and moderate difficulties in concentration, persistence and pace.  She opined that Claimant retained

the ability to learn, recall and perform simple, unskilled, work-like activities. The ALJ gave great weight to the opinions of the State Agency psychological consultants, as he considered these expert opinions to be "balanced, objective and consistent with the evidence of record as a whole" (Tr. at 25). The ALJ stated that "Although these experts did not have an opportunity to examine or treat the claimant, the reports clearly reflect a thorough review of the record and are supportable. These experts' familiarity with Social Security Administration disability evaluation program and the evidence of record warrants great weight." (*Id.*) Subsequently, the ALJ found that Claimant has mild restriction in activities of daily living and social functioning; moderate difficulties in concentration, persistence or pace; and no episodes of decompensation which have been of extended duration (Tr. at 19-20).

Claimant argues that the evidence of record documents that Claimant is disabled to perform the basic mental demands of unskilled work as described in SSR 85-15, warranting an award of benefits. Claimant asserts:

> The regulations provide that the basic mental demands of competitive, remunerative, unskilled work require an individual to have the ability to (1) to understand, carry out and remember simple instructions; (2) to respond appropriately to supervision, coworkers and usual work situations; and (3) to deal with changes in a routine work setting on a sustained basis. (Social Security Ruling 18-15. Similarly, Social Security Ruling 96-9p provides that the mental demands of sedentary work include (1) understanding, remembering and carrying out simple instructions; (2) making judgments that are commensurate with the functions of

24

unskilled work - i.e. simple work-related decisions; (3) responding appropriately to supervision, co-workers and usual work situations; and (4) dealing with changes in a routine work setting.   (*Id.*). Furthermore, these regulations recognize that a substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e. 8 hours a day, 5 days a week or an equivalent work schedule) will substantially erode the unskilled sedentary occupational base and would justify a finding of disability (SSR 85-15, 96-9p).

During the relevant time period, Plaintiff has received consistent treatment for bipolar disorder and possible posttraumatic stress disorder (*Id.*).   During a psychological consultative examination, Plaintiff was observed to be anxious with loquacious speech and to have severe deficits in recent memory and concentration (Tr. 371).   The examiner further provided that Plaintiff "may experience difficulty in keeping up with peers in a wide variety of situations that require thinking and reasoning abilities" (Tr. 370). (ECF No. 10).

In considering Claimant's symptoms, the ALJ must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce Claimant's pain or other symptoms.   Second, the ALJ must evaluate the intensity,

persistence and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's functioning.

The ALJ held that "As to activities of daily living, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" (Tr. at 24).  The ALJ relied upon the opinions of Dr. Roman, Dr. Lilly and Dr. Blair in finding that Claimant's allegations of being incapable of all work activity is not consistent with the record (Tr. at 25).  The ALJ found that "The totality of the records reveals the claimant is able to engage in basic work activities despite the limitations from his impairments."  (Id.)  Therefore, ALJ found that there was evidence that Claimant had not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as Claimant alleged (Tr. at 23). Objective medical evidence does not substantiate Claimant's pain or other symptoms.

Social Security Ruling 85-15 states that no medically determinable impairment limits exertion, the RFC reflecting the severity of the particular nonexertional impairment(s) with its limiting effects on the broad world of work is the first issue.  The second issue is the individual's relative advantages or adversities in terms of age, education and work experience.  The ALJ held that "Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform" (Tr. at 26).  The ALJ further held that "Despite the claimant's combined impairments, the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment in 20 C.F.R. part 404, Subpart P, Appendix 1" (Tr. at 21).  Therefore, the ALJ held

that Claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations. To determine the extent to which these nonexertional limitations erode the occupational base of unskilled work at all exertional levels, the ALJ asked the vocational expert at the administrative hearing whether jobs exist in the national economy for an individual with Claimant's age, education, work experience and residual functional capacity (Tr. at 26).

**Vocational Expert Testimony**

Sheleah Saunders completed a Vocational Analysis on July 27, 2010 (Tr. at 264).  Ms. Saunders assessed Claimant to "have the ability to perform 1-2 step work like activities at [substantial gainful activity] level.  At the hearing, the ALJ asked Vocational Expert Patricia Posey if there are jobs that exist in the national economy for a hypothetical individual with the same age, education and work experience as Claimant with the limitations of simple instructions and tasks, less than occasional incidental contact with the public, no team work, no fast-pace work or strict production quotas and he is functionally illiterate.  Ms. Posey testified that yes, Claimant could work as a laundry worker and a night cleaner at the light level and a food worker at the sedentary level (Tr. at 63, 64).  Ms. Posey testified that this is consistent with the Dictionary of Occupational Titles (Tr. at 64).

**Conclusion**

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner, DENY Plaintiff's Brief in Support of Judgment on the Pleadings and DISMISS this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED and a copy will be submitted to the Honorable Judge John T. Copenhaver, Jr.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date:   August 4, 2014

Dwane L. Tinsley
United States Magistrate Judge